******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MARGARITA O. *v.* FERNANDO I.*
## (AC 45708)

Bright, C. J., and Moll and Suarez, Js.**

*Syllabus*

The defendant appealed, and the plaintiff cross appealed, from the trial court's judgment granting the defendant's postdissolution motion for contempt. The defendant claimed, inter alia, that the court incorrectly calculated his share of the sale proceeds of the marital residence by, inter alia, reducing his share by $25,000 in postsecondary educational support that the court improperly ordered him to pay to the plaintiff. The plaintiff claimed that the court improperly found her in contempt. *Held*:

The trial court properly found the plaintiff in contempt of its order to list the marital residence for sale at a price of $1.25 million, as the court determined that its order was clear and unambiguous and the plaintiff, although understanding the order and being fully capable of complying with it, intentionally disobeyed the order by listing the residence for sale at a higher price.

The trial court, in calculating the distribution of the proceeds from the sale of the marital residence, properly complied with the governing language in the dissolution judgment in accounting for the closing costs and the plaintiff's postdissolution mortgage principal payments.

The trial court did not err in declining to award the defendant sanctions against the plaintiff and to adjust the defendant's financial obligations to the plaintiff pursuant to a postdissolution stipulation between the parties, as the defendant did not suffer any financial losses as a result of the plaintiff's contempt.

The trial court properly rejected, pursuant to Connecticut law, the defendant's claim for attorney's fees as a self-represented attorney litigant.

The trial court erred in reducing the defendant's share of the sale proceeds from the marital residence by $25,000 in postsecondary educational support, thus, requiring the defendant to pay the plaintiff postsecondary educational support, as the court lacked jurisdiction to consider the issue of such support

---

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

and to order the defendant to pay such support pursuant to the clear and unambiguous terms of the parties' postdissolution stipulation.

Argued December 10, 2024—officially released March 11, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Dennis F. Harrigan*, judge trial referee; judgment dissolving the marriage and granting certain other relief; thereafter, the case was transferred to the judicial district of Fairfield, where the court, *Moukawsher, J.*, granted the defendant's postjudgment motion for contempt, from which the defendant appealed and the plaintiff cross appealed to this court; subsequently, the court, *Moukawsher, J.*, denied the defendant's motion to disqualify the judicial authority, and the defendant filed an amended appeal. *Reversed in part*; *judgment directed.*

*Fernando I.*, self-represented, the appellant-cross appellee (defendant).

*Kevin F. Collins*, for the appellee-cross appellant (plaintiff).

*Opinion*

MOLL, J. The self-represented defendant, Fernando I., appeals from the postdissolution judgment of the trial court finding the plaintiff, Margarita O., in contempt of a court order, which concerned the listing of the parties' marital residence for sale, and distributing the proceeds from the sale of the residence, as well as from the court's denial of his postjudgment motion to disqualify the judicial authority. Additionally, the plaintiff cross appeals from the court's contempt finding. On direct appeal, we distill the defendant's claims to be that the court (1) incorrectly calculated his share of the sale proceeds in several ways, including by reducing his

share by $25,000 in postsecondary educational support that the court improperly ordered him to pay to the plaintiff, and (2) improperly denied his motion to disqualify. On cross appeal, the plaintiff claims that the court improperly found her in contempt because the order underlying the contempt finding was not clear and unambiguous. Turning first to the plaintiff's cross appeal, we conclude that the order at issue was clear and unambiguous, and, therefore, we reject the plaintiff's claim challenging the court's contempt finding. With respect to the defendant's direct appeal, we agree only with the defendant's claim that the court improperly ordered him to pay, and deducted from his share of the sale proceeds, $25,000 in postsecondary educational support. Accordingly, we reverse in part the judgment of the trial court.

The following facts, as found by the trial court and which are not in dispute, and procedural history are relevant to our resolution of this direct appeal and this cross appeal. The parties were married in New York in 1995. Three children were born of the marriage. In 2009, the plaintiff commenced the present action, initially seeking a legal separation, but later amending her complaint to request a dissolution of the marriage on the basis that it had broken down irretrievably. The defendant filed an amended answer directed to the plaintiff's original complaint, as well as an amended cross complaint seeking a dissolution of the marriage on the basis that it had broken down irretrievably.

On September 2, 2010, the court, *Hon. Dennis F. Harrigan*, judge trial referee, rendered a judgment dissolving the parties' marriage on the ground of irretrievable breakdown. The dissolution judgment ordered the following with respect to the parties' jointly owned marital residence in Greenwich (residence): "The [plaintiff] shall continue to have exclusive possession of the . . . residence. The [plaintiff] shall pay all monthly

expenses of the residence including maintenance and repairs except that the parties shall each pay one half of the property taxes pertaining to the residence. On or before April 1, 2021, the year in which the [parties'] youngest child reaches eighteen [years of age], the parties shall list the [residence] for sale with a real estate broker at the then fair market value of the [residence]. The [plaintiff] shall also have the right to list the [residence] for sale at any time between the date of the [dissolution judgment] and April 1, 2021, and the [defendant] shall cooperate. The [defendant] may demand an immediate sale upon the [plaintiff's] remarriage, or cohabitation without proof of change in finances as required by [statute]. At the closing of title regarding the sale of the  . . .  residence, the first mortgage, any broker's commissions and all normal closing costs shall be paid and the remaining proceeds shall be divided equally after a credit is paid to the [plaintiff] for the difference between the balance on the first mortgage on the date of the [dissolution judgment] and the balance of the mortgage on the date of the closing regarding the sale of the residence. Any sums due to the [plaintiff] pursuant to any orders of the court shall be paid to the [plaintiff] at the closing from the [defendant's] portion of the net closing proceeds." Additionally, pursuant to General Statutes § 46b-56c,[1] the court retained jurisdiction to enter educational support orders with respect to the parties' children. Neither party appealed from the dissolution judgment.

On December 15, 2015, the plaintiff filed a motion for contempt claiming that the defendant failed to pay

---

[1] Since the court rendered the dissolution judgment on September 2, 2010, § 46b-56c has been the subject of several amendments that, other than as noted in footnote 5 of this opinion, are not relevant to this appeal. See 2011 Public Acts, No. 11-214, § 6; 2015 Public Acts, No. 15-71, § 80; 2021 Public Acts, No. 21-104, § 19; 2022 Public Acts, No. 22-123, § 40. In the interest of simplicity, we refer to the current revision of the statute.

child support, real estate taxes, and other financial obligations as ordered pursuant to the dissolution judgment, as well as certain legal fees awarded to the plaintiff. On June 10, 2016, the parties executed a stipulation (2016 stipulation), which the court, *Tindill, J.*, approved that same day. The 2016 stipulation provided, inter alia, that (1) the defendant would pay the plaintiff $400,000, which would be credited to the plaintiff out of the defendant's share of the proceeds from the future sale of the residence, (2) "[i]n full satisfaction of [the] [p]laintiff's [December 15, 2015] [m]otion for [c]ontempt . . . and/or any financial claims of any nature whatsoever, the parties agree that the [d]efendant shall no longer be responsible to pay [the] [p]laintiff'' various expenses, and (3) subject to a provision in the 2016 stipulation regarding postsecondary educational support, "[the] [p]laintiff hereby acknowledges that [the] [d]efendant by virtue of the terms set forth hereinbefore, shall be deemed to have satisfied in full all financial obligations set forth in [the 2016] [s]tipulation and the [dissolution judgment], and [the] [d]efendant shall have no further obligation to pay any sums to [the] [p]laintiff."

On January 31, 2022, the court, *Moukawsher, J.*, issued a memorandum of decision addressing disputes that had arisen between the parties regarding (1) the sale of the residence and (2) postsecondary educational support.[2] With respect to the sale of the residence, which, as the court found, had not occurred prior to April, 2021, as required by the dissolution judgment, the court interpreted the dissolution judgment to mandate that the residence be listed for sale at its fair market value on the date of the listing. The court recognized that the parties disagreed about the residence's

---

[2] On March 3, 2020, the plaintiff filed a motion seeking postsecondary educational support. On January 28 and April 23, 2021, the defendant filed motions for contempt asserting, inter alia, that the plaintiff had failed to cooperate with him in listing the residence for sale in compliance with the dissolution judgment.

fair market value, with (1) the defendant, relying on "his opinion . . . based on his knowledge of the area and most of all on what he claims a real estate broker told him," proposing a valuation of $1.8 million and (2) the plaintiff, relying on a professional appraisal dated January 4, 2022, which was admitted into evidence, valuing the residence at $1.25 million. The court determined that it "ha[d] little choice but to accept [the plaintiff's valuation of $1.25 million] as the fair market value. Using any other number would be guesswork." The court ordered the parties, within twenty-one days, to list the residence for sale for $1.25 million with a mutually agreed on real estate broker, with the court reserving the authority to select a broker if the parties were unable to choose one together.

Turning to the issue of postsecondary educational support, the court cited paragraph 10 of the 2016 stipulation, which provides: "The parties agree that if the [d]efendant were to have income as well as financial and patrimonial means comparable to the [p]laintiff, the [d]efendant will assume his equal share of the [postsecondary] educational expenses of their children paid by the [p]laintiff. [Subject][3] to the prior, if the [d]efendant were not to pay for those expenses, the [c]ourt shall retain jurisdiction over said issue pursuant to [§ 46b-56c][4] for all of the three . . . children of the marriage." (Footnotes added.) The court stated that, although the parties agreed that they did not have comparable incomes, they disputed whether, pursuant to paragraph 10, the court had jurisdiction to enter postsecondary educational support orders. The court determined that both parties had presented reasonable interpretations of paragraph 10, implicitly concluding that

[3] The second sentence of paragraph 10 of the 2016 stipulation begins with the word "Subjecto." The court deemed this to be a typographical error, as do we.

[4] The 2016 stipulation cites to General Statutes (Rev. to 2015) § 46b-56 (c), rather than to § 46b-56c. We construe this to be a typographical error.

the provision was ambiguous. Upon examining the language of paragraph 10 and evidence admitted into the record, the court concluded that it retained jurisdiction regarding postsecondary educational support. The court subsequently scheduled an evidentiary hearing to determine the appropriate amount of postsecondary educational support.

On April 7, 2022, the court issued a memorandum of decision further addressing the sale of the residence. The court stated that it "wishe[d] its [January 31, 2022] order to be interpreted as requiring the [residence] to be listed for $1.25 million but with a view toward selling the [residence] for the highest possible dollar amount. It knows from its recent experience with two hearings [that the defendant] boycotted that [the defendant], living in Argentina and nursing his grievances, will not cooperate in getting this job done. The [residence] is in [the parties'] joint names. As it stands now, [the defendant] could potentially block—and the court is convinced he would block—every attempt to try to carry out the sale. Therefore, it will make orders concerning the sale that reflect this unhappy conclusion . . . ." First, "[t]o effectuate the court-ordered sale of [the residence]," the court ordered that any interest in the residence held by the defendant was transferred to the plaintiff, "in trust, for the sole purpose of effectuating under the court's orders [of September 2, 2010, and January 31, 2022], the sale of the [residence] . . . ." The court further ordered, inter alia, that (1) by no later than April 21, 2022, the plaintiff would list the residence for sale with a particular real estate broker for $1.25 million, (2) the plaintiff would instruct the broker that, although there was a court-ordered $1.25 million listing price, she had been ordered by the court "to work with [the broker] to realize the maximum possible sales price," and (3) the plaintiff required the court's permission to sign any contract for the sale of the residence.

Additionally, in a separate memorandum of decision issued on April 7, 2022, the court further addressed the issue of postsecondary educational support. On the basis of the evidence adduced at the evidentiary hearing held by the court, and in consideration of the provisions of § 46b-56c (g),[5] the court determined that the total amount of postsecondary educational support subject to allocation was capped at $201,500. The court proceeded to award the plaintiff $25,000 in postsecondary educational support from the defendant, reasoning that, "[g]iven [the plaintiff's] real earning capacity, the evidence reflects a serious imbalance between the two parties but [that] does not warrant [the defendant]— who has paid none of the court's orders so far—to escape any responsibility for his children's college education given his potential earning capacity. Therefore, he will pay only a portion of what [the plaintiff] suggests as calculated by the court under the [University of Connecticut statutory] cap [of § 46b-56c (g)] or $25,000." The court ordered the $25,000 amount to be credited to the plaintiff out of the defendant's share of the proceeds from the future sale of the residence.

On April 25, 2022, the defendant filed a motion for contempt claiming that the plaintiff had listed the residence for sale for $1.6 million, rather than for $1.25 million as ordered by the court. As relief, the defendant sought, inter alia, "legal fees, expenses, monetary sanctions, and damages . . . ." On April 27, 2022, the plaintiff filed a motion requesting that the court approve the

_____

[5] General Statutes § 46b-56c (g) provides: "The educational support order may include support for any necessary educational expense, including room, board, dues, tuition, fees, registration and application costs, but such expenses shall not be more than the amount charged by The University of Connecticut for a full-time in-state student at the time the child for whom educational support is being ordered matriculates, except this limit may be exceeded by agreement of the parents. An educational support order may also include the cost of books and medical insurance for such child."

The court cited to subsection (f) of § 46b-56c, which, prior to an amendment in 2021; see 2021 Public Acts, No. 21-104, § 19; set forth the language that is now contained in subsection (g).

sale of the residence pursuant to an appended offer to purchase, which reflected a proposed sale price of $1,671,000. On May 3, 2022, the court approved a proposed contract for the sale of the residence for $1,671,000 and authorized the plaintiff to execute the contract.

On July 26, 2022, the court issued a memorandum of decision resolving the defendant's April 25, 2022 motion for contempt and ordering the distribution of the proceeds from the sale of the residence.[6] The court found the plaintiff in contempt of its January 31, 2022 order, as expounded on by the court on April 7, 2022, concerning the sale of the residence, determining that (1) the order was clear and unambiguous in requiring that the residence be listed for sale for $1.25 million and (2) despite understanding the order and being fully capable of complying with it, the plaintiff intentionally disobeyed the order by listing the residence for sale for $1.6 million.

Turning to the appropriate remedy for the plaintiff's contempt, the court noted that the defendant was requesting "equitable adjustments to the closing proceeds that effectively [would] reopen [the] parties' prior agreement and adjust them to reflect his view of how they should have been handled." Iterating that, on a contempt motion, the court had the authority to order the contemnor to pay the opposing party for losses caused by the contempt, the court determined that the defendant did not suffer any losses as a result of the plaintiff having listed the residence for sale for $1.6 million but, rather, "[h]e gained money by her disobedience . . . ." The court further determined that the defendant was not entitled to attorney's fees because he had not been represented by counsel.

---

[6] The record reflects that the closing occurred on July 14, 2022.

The court proceeded to order a distribution of the sale proceeds. After performing several adjustments, including crediting the plaintiff $25,000 against the defendant's share of the sale proceeds for postsecondary educational support, the court awarded $1,154,554.97 to the plaintiff and $267,713.03 to the defendant. On August 2, 2022, the defendant filed a motion to reargue, which the court denied on August 5, 2022. On August 9, 2022, the defendant filed a direct appeal, and, on August 16, 2022, the plaintiff filed a cross appeal.[7]

On August 26, 2022, the defendant filed a motion to disqualify Judge Moukawsher, which the court denied on September 9, 2022. On September 19, 2022, the defendant filed a separate appeal from the denial of his motion to disqualify, which separate appeal this court treated as an amendment to this direct appeal pursuant to Practice Book § 61-9. Additional facts and procedural history will be set forth as necessary.[8]

I

On cross appeal, the plaintiff maintains that the trial court improperly found that she was in contempt of the January 31, 2022 order, as expounded on by the court on April 7, 2022, requiring that the residence be listed for sale for $1.25 million (January, 2022 order). The plaintiff asserts that the January, 2022 order was not clear and unambiguous in precluding her from listing the residence for sale for a price greater than $1.25 million. We disagree.

[7] On August 12, 2022, the plaintiff filed a motion to reargue, which the court, after having ordered reargument, denied on the merits on December 28, 2022.

[8] In their respective appellate briefs, each party contends that the other party's claims are inadequately briefed. See *McNamara* v. *McNamara*, 207 Conn. App. 849, 868, 263 A.3d 899 (2021) ("[i]t is well established that [w]e are not required to review claims that are inadequately briefed" (internal quotation marks omitted)). Except for certain claims addressed in footnotes 13 and 14 of this opinion, we conclude that the parties have adequately briefed their respective claims.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . [C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt remedy is particularly harsh . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . . To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . If we answer that question affirmatively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Internal quotation marks omitted.) *Walton* v. *Walton*, 227 Conn. App. 251, 257–58, 321 A.3d 1180 (2024), cert. granted, 351 Conn. 903, 329 A.3d 240 (2025).

The record reflects that, on January 31, 2022, the court ordered the parties to "list [the residence] for sale at a listing price of $1.25 million . . . ." Later, in its April 7, 2022 decision concerning the sale of the residence, the court stated that its January 31, 2022 order was "to be interpreted as requiring the [residence] to be listed for $1.25 million, but with a view toward selling the [residence] for the highest possible dollar amount." The court then issued additional orders (1) instructing the plaintiff to "list the [residence] for sale

with [a particular real estate broker] for the sum of $1.25 million" and (2) directing the plaintiff to "instruct [the broker] that while the court requires the [residence] to be listed for the sum of $1.25 million, the court has ordered her to work with [the broker] to realize the maximum possible sales price."

In its July 26, 2022 decision, the court explained that the January, 2022 order "explicitly reflected [two] aspects" of statements that it had made on the record. First, in agreement with an argument that the plaintiff had raised, the court determined that the dissolution judgment required the residence to be listed for sale at its fair market value, which the court found to be $1.25 million. Second, in response to protests by the defendant that the residence was worth more than $1.25 million, the court opined that, if the defendant's representation were true, "then the current market conditions would prompt a bidding war in which 'you're going to get all kinds of bids of people who are going to compete to get [the residence] and it will sell for more than $1.25 million . . . .' "

Turning to the substance of the January, 2022 order, the court stated: "[The plaintiff could not] possibly have interpreted an order 'requiring the [residence] to be listed for $1.25 million' as not requiring the [residence] to be listed for $1.25 million. Yet she listed the [residence] for $1.6 million, later claiming that she interpreted this sentence as permitting it to be listed at a price other than $1.25 million. Against the backdrop of the discussion on the record and the express words of the court's order, [the plaintiff] could not in good faith have concluded that she was free to list the [residence] for whatever amount she wished above $1.25 million."

The plaintiff concedes that she listed the residence for sale "substantially above" the court-ordered price of $1.25 million. The plaintiff maintains, however, that

the January, 2022 order was not clear and unambiguous because it required both that the residence be (1) listed for sale for $1.25 million *and* (2) sold " 'for the highest possible dollar amount,' " such that the order reasonably could be interpreted as having permitted her to list the residence for a higher sale price in "a good faith effort to sell the [residence] at the optimal price . . . ." We are not persuaded. The January, 2022 order clearly and unambiguously directed that the listing price for the sale of the residence was to be set at $1.25 million. We do not agree with the plaintiff that the additional language concerning the sale of the residence " 'for the highest possible dollar amount' " can be reasonably construed to have authorized her to list the residence for sale at a price greater than $1.25 million. Reading the January, 2022 order in its entirety, we interpret the order, in plain terms, to mandate listing the residence for sale for $1.25 million while authorizing the sale of the residence, once listed for the required price, for the highest possible price.

Our conclusion is further bolstered by the court's additional orders entered in its April 7, 2022 decision concerning the sale of the residence, which additional orders were not addressed expressly by the court in its July 26, 2022 decision or analyzed by the parties in their respective appellate briefs. On April 7, 2022, the court issued additional orders requiring the plaintiff (1) by no later than April 21, 2022, to list the residence for sale with a particular real estate broker for $1.25 million and (2) to instruct the broker that, although the residence had to be listed for sale for $1.25 million per court order, she had been ordered by the court "to work with [the broker] to realize the maximum possible sales price . . . ." These additional orders tracked the January, 2022 order in (1) requiring the residence to be listed for sale for $1.25 million while (2) allowing the residence to be sold for the highest possible price. In

no uncertain terms, however, the court ordered that the residence's listing price be set at $1.25 million.

In sum, we conclude that the January, 2022 order was clear and unambiguous in ordering that the residence be listed for sale for $1.25 million. Accordingly, we reject the plaintiff's claim on cross appeal.

## II

On direct appeal, the defendant claims that the trial court committed various errors in calculating his share of the proceeds from the sale of the residence. The defendant maintains that the court improperly (1) failed to allocate to the plaintiff the entirety of (a) closing costs incurred in connection with the sale and (b) post-dissolution mortgage principal payments made by the plaintiff, (2) failed to award him, and to credit him in calculating his share of the sale proceeds, $250,000 as a sanction for purported misconduct by the plaintiff, (3) reduced his share of the sale proceeds by $400,000 for the payment owed by him to the plaintiff pursuant to the 2016 stipulation, which amount, the defendant posits, should have been "[l]egal[ly] and equitabl[y] adjust[ed]" to $185,000, (4) failed to award him, and to credit him in calculating his share of the sale proceeds, attorney's fees that he purportedly incurred in connection with his April 25, 2022 motion for contempt, and (5) ordered him to pay the plaintiff $25,000 for postsecondary educational support, which the court deducted from his share of the sale proceeds. We agree only with the defendant's claim that the court improperly ordered him to pay $25,000 in postsecondary educational support.[9]

---

[9] The defendant also contends that his constitutional rights to due process and to equal protection under the law were violated during the proceedings before the trial court, primarily referencing adverse rulings and comments made by Judge Moukawsher. We construe these assertions, in substance, to advance the defendant's claim that the court improperly denied his motion to disqualify Judge Moukawsher, which decision, as the defendant expressly acknowledges in his principal appellate brief, is at issue on direct appeal.

The following additional facts and procedural history are relevant to our resolution of the defendant's claims. According to a closing summary document appended as an exhibit to the July 26, 2022 decision, (1) the plaintiff sold the residence for $1,671,000, which, after subtracting a tax adjustment afforded to the buyer, left $1,670,677.64 in available funds, and (2) the net sale proceeds were $1,445,246.59, after various sums totaling $225,431.05 were deducted, including closing costs and a lien payoff in the amount of $18,420.97.

The court calculated the parties' respective shares of the sale proceeds as follows. First, the court determined that the amount available for distribution totaled $1,422,268, calculated by taking the $1,445,246.59 in net sale proceeds and (1) adding back the $18,420.97 lien, for which the defendant was solely responsible pursuant to the 2016 stipulation,[10] and (2) subtracting postdissolution mortgage principal payments made by the plaintiff, totaling $41,399.56. After dividing the distribution amount into equal shares of $711,134, the court reduced the defendant's share, and simultaneously increased the plaintiff's share, by (1) $400,000, the amount owed by the defendant to the plaintiff pursuant to the 2016 stipulation, (2) $18,420.97, the amount of the lien for which the defendant was responsible,[11] and (3) $25,000, the amount of the defendant's obligation for postsecondary educational support ordered by the

In denying the motion to disqualify, the court determined that "[t]he motion turns on disagreeing with the court's opinions and reflects no basis the court need consider under Practice Book § 1-22." On the basis of our careful review of the available record, we conclude that the defendant's claim is without merit.

[10] Paragraph 12 of the 2016 stipulation provides: "The . . . lien . . . shall be the sole responsibility of the [d]efendant, to be paid from his distribution of the net equity [realized] from the sale of the [residence] per the [dissolution judgment]."

[11] The defendant does not dispute that the court properly deducted the amount of the lien from his share of the sale proceeds. See footnote 10 of this opinion.

court on April 7, 2022. In sum, the court awarded $1,154,554.97 to the plaintiff and $267,713.03 to the defendant.

Before turning to the defendant's claims, we set forth the governing standard of review. "[T]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Footnote omitted; internal quotation marks omitted.) *K. D.* v. *D. D.*, 214 Conn. App. 821, 825–26, 282 A.3d 528 (2022).

Additionally, some of the defendant's claims require us to construe the 2016 stipulation and/or the dissolution judgment. "In domestic relations cases, [a] judgment rendered in accordance with . . . a stipulation of the parties is to be regarded and construed as a contract. . . . It is well established that [a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect

according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . In contrast, an agreement is ambiguous when its language is reasonably susceptible of more than one interpretation. . . . Nevertheless, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Wethington* v. *Wethington*, 223 Conn. App. 715, 730–31, 309 A.3d 356 (2024). With respect to the dissolution judgment, "[a]s a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . [W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Internal quotation marks omitted.) *Buchenholz* v. *Buchenholz*, 221 Conn. App. 132, 138, 300 A.3d 1233, cert. denied, 348 Conn. 928, 304 A.3d 860 (2023).

## A

The defendant contends that the court impermissibly failed to allocate to the plaintiff the entirety of the closing costs and the $41,399.56 in postdissolution mortgage principal payments remitted by the plaintiff. The defendant asserts that the plaintiff, pursuant to the 2016

stipulation, assumed sole responsibility for these costs and payments. We disagree.

The dissolution judgment expressly delineated how certain amounts, including closing costs and the plaintiff's postdissolution mortgage principal payments, were to be taken into account when distributing the proceeds from the future sale of the residence. As the dissolution judgment ordered, "[a]t the closing of title regarding the sale of the . . . residence, the first mortgage, any broker's commissions and all normal closing costs shall be paid and the remaining proceeds shall be divided equally after a credit is paid to the [plaintiff] for the difference between the balance on the first mortgage on the date of the [dissolution judgment] and the balance of the mortgage on the date of the closing regarding the sale of the residence." The court's calculations reflect that it complied with this provision by accounting for the closing costs and the plaintiff's post-dissolution mortgage principal payments before dividing the sale proceeds equally between the parties, subject to adjustments.

Relying on paragraphs 2, 5, and 7 of the 2016 stipulation, the defendant, in substance, asserts that the 2016 stipulation superseded the aforementioned language in the dissolution judgment such that the court should have allocated the closing costs and the plaintiff's post-dissolution mortgage principal payments solely to the plaintiff. We do not agree with the defendant's interpretation of the 2016 stipulation.

We first turn to paragraph 5 of the 2016 stipulation, which provides that the plaintiff acknowledged that, subject to an exception that is inapplicable here, "[the] [d]efendant by virtue of the terms set forth hereinbefore, shall be deemed to have satisfied in full all financial obligations set forth in [the 2016] [s]tipulation and the [dissolution judgment], and [the] [d]efendant shall have

no further obligation to pay any sums to [the] [p]laintiff." We are not persuaded by the defendant's proposition that the language in the dissolution judgment concerning the distribution of the sale proceeds burdened the defendant with "financial obligations" requiring payment to the plaintiff. The language at issue in the dissolution judgment mandated the deduction of certain sums, including closing costs and the plaintiff's postdissolution mortgage principal payments, from the sale proceeds before the proceeds were divided between the parties. In our view, such deductions cannot be reasonably construed to be akin to "financial obligations" subject to payment by the defendant. Accordingly, the defendant's reliance on paragraph 5 is misplaced.

We next consider paragraph 2 of the 2016 stipulation, which provides that, "[i]n full satisfaction of [the] [p]laintiff's [December 15, 2015] [m]otion for [c]ontempt . . . and/or any financial claims of any nature whatsoever, the parties agree that the [d]efendant shall no longer be responsible to pay [the] [p]laintiff any future or past due contributions for or on behalf of the minor children for child support, childcare expenses, medical expenses, children's activities, real property taxes, legal fees, private school tuition, summer camps and/or automobile related expenses for the minor children, among others." That provision makes no mention of closing costs or mortgage payments. Moreover, as we concluded with respect to paragraph 5, the dissolution judgment's language concerning closing costs and mortgage payments did not create a financial obligation requiring payment by the defendant, ergo, there was no financial responsibility for such expenses from which the defendant could have been released pursuant to paragraph 2.

Last, the defendant relies on paragraph 7 of the 2016 stipulation, which provides: "All of the obligations by

the [p]laintiff in terms of necessary repairs, mainte-
nance and payments of mortgage and real property
taxes of the [residence] shall be in compliance with the
terms of the [dissolution judgment]." This provision
iterated the plaintiff's obligations pursuant to the disso-
lution judgment and made no changes to the dissolution
judgment's language providing instructions as to the
distribution of the sale proceeds.

In sum, we conclude that the court, in calculating
the distribution of the sale proceeds, properly complied
with the governing language in the dissolution judgment
in accounting for the closing costs and the plaintiff's
mortgage principal payments. Accordingly, the defen-
dant's claim fails.

B

The defendant next claims that the court improperly
failed (1) to award him $250,000 in sanctions against
the plaintiff for "overall procedural misconduct" and (2)
to make "[l]egal and equitable adjustments" to reduce,
from $400,000 to $185,000, the payment that he owed
to the plaintiff pursuant to the 2016 stipulation, which
amounts, the defendant contends, should have been
credited to his share of the sale proceeds. We are not
persuaded.

In its July 26, 2022 decision, the court stated the
following with respect to the defendant's damages stem-
ming from the finding of contempt against the plaintiff:
"[The defendant] argues that [the plaintiff] was caught
in her own trap. [The defendant] says [that the plaintiff]
originally schemed to deflate the sales price of the [resi-
dence] as low as possible while inflating the reductions
in [the defendant's] share of the proceeds as high as
possible. This, [the defendant] claims, would have
allowed [the plaintiff] to argue that the court could
simply transfer [the defendant's] share to [the plaintiff]
rather than list the [residence] for sale. [The defendant]

contends that this would have been a great windfall to [the plaintiff]. He believes the [residence] was worth $1.8 million and that [the plaintiff] intended to cheat him out of the difference between $1.8 million and $1.25 million, or $550,000. [The defendant] proposes equitable adjustments to the closing proceeds that effectively [would] reopen [the] parties' prior agreement and adjust them to reflect his view of how they should have been handled.

"The trouble is that this is a motion for contempt. [The plaintiff's] counsel sought quite expressly to make that quite clear, and with every opportunity to say otherwise, [the defendant] agreed that it was a motion for contempt concerning the higher listing price. This has implications. As our Appellate Court made clear in 2008 in *Edmond* v. *Foisey*, [111 Conn. App. 760, 769–70, 961 A.2d 441 (2008)], for this kind of contempt, the court has the power to order the party in contempt to pay the party not in contempt for losses caused by the disobedience.

"The disobedience here is [the plaintiff] listing the [residence] for $1.6 million when the court ordered her to list it for $1.25 million. If [the plaintiff] had obeyed the court's order, [the defendant] would have lost money. He gained money by her disobedience, so there is no direct link between her actions and any loss on [the defendant's] part.

"[The defendant] claims the court should see this disobedience as a component of the larger scheme he alleges did damage him and asks the court to equitably readjust the closing proceeds to reflect the harm he claims the scheme caused. He claims the [residence] was worth $1.8 million. Maybe he's right. But 'maybe' isn't enough in court, and it more clearly isn't enough when a party is asking the court to cause an opposing party to forfeit thousands of dollars as a consequence.

"[The defendant] bases his claim on his own opinion supported by his claim that a . . . Realtor recommended a $1.8 million listing price. He also points to various Zillow[12] listings. But those listings came into evidence because [the plaintiff] agreed to them coming in, and they came in because some of the information in them specifically supported her view, not his. [The defendant] is asking for an enormous consequence and bases this consequence on ground not firm enough to support it.

"Besides, if [the defendant] is correct, [the plaintiff's] plan backfired. If [the defendant] has lost thousands of dollars from a deflated sales price, so has [the plaintiff]. While [the defendant] complains about [the plaintiff's] maneuvering over the appraisal and her plan to gain possession of the [residence] without paying him anything, that effort failed. Perhaps if [the defendant] had offered expert testimony at the time the court valued the [residence] for sale it might have convinced the court that the [residence] was worth $1.8 million, and the court would have ordered a higher listing price. Based on the actual sales price [of $1,671,000], the court knows that original number [of $1.25 million] was wrong, but the court still can't say the [residence] would have sold for $1.8 million with enough conviction to base a sanction on it.

"In any case, the court remains convinced that it must measure the sanction by what [the defendant] lost because [the plaintiff] listed the [residence] for sale at

---

[12] "'Zillow is an online real estate marketplace website that offers comprehensive real estate market data, including estimated values of real property.' *Wahba* v. *JPMorgan Chase Bank, N.A.*, 349 Conn. 483, 490 n.3, 316 A.3d 338 (2024); see also *San Diego* v. *Invitation Homes, Inc.*, Docket No. 22-cv-260-L (MDD), 2023 WL 35217, *1 n.2 (S.D. Cal. January 3, 2023) (Zillow 'hosts a database of homes for sale, homes for rent, and homes not currently on the market as well as home value and rent estimates, among other home-related information')." *Mulvihill* v. *Spinnato*, 228 Conn. App. 781, 783–84 n.5, 326 A.3d 251, cert. denied, 350 Conn. 926, 326 A.3d 248 (2024).

a higher price than directed. It does not have the power to address the larger scheme [the defendant] claims. The loss is thus zero. Therefore, the court cannot award him anything based upon the failure to obey. . . .

"[The defendant's] requests are based on a mistakenly expansive view of the court's power. The court may be sitting in equity, but it is bound by the rules set by the upper courts on how to measure a sanction for contempt. [The defendant] also mistakenly believes that [the plaintiff's] effort to acquire the [residence] free of his claims is more worthy of censure than it is. Experts today usually aren't impartial, but [the defendant] hasn't proven that the appraisal at issue was the product of fraud. He suspects that [the plaintiff's] lawyer suggested they were looking for a low appraisal, but he hasn't proved anything other than that the appraisal was wrong. And even if the court thought what he claimed was possible, it doesn't make it probable, and it doesn't make it clearly and convincingly true—the standard by which courts find fraud. [The defendant's] evidence is not strong enough to support the relief he wants even if it were permissible." (Footnote added; footnote omitted.)

As an initial matter, it is pertinent that the court's finding of contempt against the plaintiff was predicated on the plaintiff having listed the residence for sale for $1.6 million, rather than for $1.25 million as ordered by the court. As the court aptly determined, "[i]f [the plaintiff] had obeyed the court's order, [the defendant] would have lost money. He gained money by her disobedience, so there is no direct link between her actions and any loss on [the defendant's] part." Without any financial losses suffered by the defendant as a result of the plaintiff's contempt, the court properly declined to impose the sanctions or make the "[l]egal and equita-

ble adjustments" proposed by the defendant.[13] See *Medeiros* v. *Medeiros*, 175 Conn. App. 174, 203, 167 A.3d 967 (2017) ("Judicial sanctions in civil contempt proceedings may, in a proper case, be employed . . . to compensate the complainant for losses sustained. . . . Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of [the] complainant's actual loss . . . . Civil contempt proceedings are not punitive—i.e., they are not imposed for the purpose of vindicating the court's authority—but are purely remedial.

---

[13] The defendant also maintains that the plaintiff should have been sanctioned for making several "false denials" in a January, 2022 response to a request for admission propounded by the defendant. See Practice Book § 13-25 ("If a party fails to admit the genuineness of any document or the truth of any matter as requested herein, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, such party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The judicial authority shall make the order unless it finds that such failure to admit was reasonable."); see also *White Sands Beach Assn., Inc.* v. *Bombaci*, 287 Conn. 302, 306 n.6, 950 A.2d 489 (2008) ("Section 13-25, by its terms, contemplates that motions to assess costs be considered and decided postjudgment. . . . Until the trial court determines what facts have been proven true or what documents have been shown to be genuine, any argument that a party wrongfully has refused to admit their truth or genuineness necessarily is premature." (Citation omitted.)). Although the defendant raised this claim in the trial court, the court made no findings as to whether (1) the plaintiff failed to admit to matters demonstrated by the defendant to be true or (2) any such failures were reasonable. In the defendant's motion to reargue, which the court summarily denied, the defendant argued that the court failed to address the purported false denials committed by the plaintiff. In his principal appellate brief, the defendant makes an isolated statement that the court failed to "address the issue of the plaintiff's overall procedural misconduct"; however, we do not construe this standalone statement to constitute a cognizable claim that the court erred in not addressing the defendant's § 13-25 claim. Insofar as the defendant has raised a cognizable claim in this regard, it is inadequately briefed and, therefore, we deem it to be abandoned. See *McNamara* v. *McNamara*, 207 Conn. App. 849, 868, 263 A.3d 899 (2021). Without findings made by the court pursuant to § 13-25 or a proper claim of error raised by the defendant with respect to the lack of such findings, we reject the defendant's reliance on § 13-25.

. . . [I]t is well settled . . . that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender. . . . [S]uch a compensatory fine must necessarily be limited to the actual damages suffered by the injured party as a result of the violation . . . .'' (Emphasis omitted; internal quotation marks omitted.)); *Edmond* v. *Foisey*, supra, 111 Conn. App. 769 (''[s]anctions for civil contempt may be either a fine or imprisonment; the fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained'' (internal quotation marks omitted)).

Assuming that the sanctions and ''[l]egal and equitable adjustments'' sought by the defendant were legally viable, from what we can reasonably glean from the defendant's appellate briefs, at the core of his requests for such sanctions and adjustments was his contention that the plaintiff engaged in a ''criminal plot to defraud him'' by failing to cooperate with him, beginning in early 2021, in order to attempt to sell the residence for $1.8 million, the valuation that he proposed. The court determined, however, that the defendant failed to offer adequate evidence supporting that valuation. In its January 31, 2022 decision, the court determined that the defendant ''presented only his opinion . . . based on his knowledge of the area and most of all on what he claim[ed] a real estate broker told him. But he didn't give enough information about the former and the court can't consider what a nontestifying broker had to say.'' In its April 7, 2022 decision regarding the sale of the residence, in discussing its prior determination that the residence's fair market value was $1.25 million, the court stated that it had an ''obligation to set that fair market value in accord with the expert evidence rather

than to accept hearsay evidence or [the defendant's] opinion based on inadequate sales data." In its July 26, 2022 decision, the court further stated that "[the defendant] bases his claim on his own opinion supported by his claim that a . . . Realtor recommended a $1.8 million listing price. He also points to various Zillow listings, [which came into evidence without objection and which] came in because some of the information in them specifically supported [the plaintiff's view], not [the defendant's]. [The defendant] is asking for an enormous consequence and bases this consequence on ground not firm enough to support it. . . . Perhaps if [the defendant] had offered expert testimony at the time the court valued the [residence] for sale it might have convinced the court that the [residence] was worth $1.8 million, and the court would have ordered a higher listing price. Based on the actual sales price, the court knows that the original number was wrong, but the court still can't say the [residence] would have sold for $1.8 million with enough conviction to base a sanction on it."

The available record supports the court's determination that the defendant did not present sufficient evidence to support his $1.8 million valuation of the residence. First, we note that the defendant did not order transcripts of the underlying proceedings, whereas the plaintiff ordered one transcript of a June 17, 2022 hearing. The June 17, 2022 transcript does not reflect testimony concerning the defendant's $1.8 million valuation of the residence. Insofar as testimony was elicited during other proceedings before the court supporting the defendant's valuation, the defendant has failed to provide us with an adequate record of the same.[14] See

---

[14] The defendant makes a couple of fleeting references to the court "refus[-ing]" to subpoena a real estate broker to testify in support of the $1.8 million valuation. On January 19, 2022, the defendant filed a motion requesting that, if deemed necessary, the court issue a subpoena for a certain broker to appear and to testify. The trial court file does not reflect a ruling by the court on that motion. In his motion to disqualify Judge Moukawsher, as

Practice Book § 61-10 (a) ("It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire record is complete, correct and otherwise perfected for presentation on appeal.").

Additionally, the available record reflects that the only exhibits offered by the defendant, and admitted in full by the court, addressing his $1.8 million valuation during the underlying proceedings comprised correspondence in which the defendant personally attributed that valuation to the residence. It was well within the court's discretion to reject the defendant's proposed valuation predicated solely on the defendant's own opinion. See *Seder* v. *Errato*, 211 Conn. App. 167, 180, 272 A.3d 252 ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" (internal quotation marks omitted)), cert. denied, 343 Conn. 917, 274 A.3d 868 (2022). Insofar as the defendant relied on other documents to support his valuation of $1.8 million, the

well as in his motion to reargue, the defendant represented that the court stated on the record that the subpoena was " 'not necessary.' " (Emphasis omitted.) The defendant's representations of what occurred on the record, however, are not a permissible substitute for transcripts of the proceedings before the court. To the extent that the court addressed the defendant's January 19, 2022 motion on the record, the defendant has not provided us with the relevant transcript(s), leaving us to speculate as to the court's disposition of that motion. See Practice Book § 61-10 (a).

Additionally, in a "motion for order postjudgment" filed by the defendant on February 28, 2022, the defendant requested, among other things, that the court (1) order an updated market valuation of the residence and (2) issue a subpoena for the broker to testify. The court summarily denied the motion on the same day. The defendant does not expressly address this ruling in his appellate briefs. Thus, insofar as the defendant claims error with respect to the court's February 28, 2022 ruling vis-à-vis the issuance of a subpoena for the broker, the defendant has failed to adequately brief that claim, thereby abandoning it. See *McNamara* v. *McNamara*, 207 Conn. App. 849, 868, 263 A.3d 899 (2021).

available record reflects that no such documents were admitted into the record.[15]

In short, having failed to adduce adequate evidence that the fair market value of the residence was $1.8 million, the defendant's contention that the court improperly failed to award him sanctions and other "[l]egal and equitable adjustments" stemming from the plaintiff's purported misconduct in failing to pursue a sale of the residence for $1.8 million is untenable.[16]

In sum, we conclude that the court did not commit error in declining (1) to award the defendant, and to credit him in calculating his share of the sale proceeds, $250,000 as sanctions against the plaintiff and (2) to adjust the defendant's $400,000 financial obligation to the plaintiff pursuant to the 2016 stipulation to $185,000.

C

The defendant also contends that the court improperly failed to award him, and to credit him in calculating

---

[15] During the proceeding on June 17, 2022, the defendant offered into evidence a screenshot of a Zillow listing, which was represented as being dated June 2, 2022, reflecting that the residence had an estimated market value of $1,775,400; however, the court reserved judgment as to its admission and, ultimately, never admitted it as a full exhibit. Separately, the court admitted in full an exhibit offered by the defendant reflecting a Zillow listing indicating that the residence (1) had been listed for sale for $1.6 million on April 19, 2022, (2) had been listed on Zillow for eight days, and (3) had a current estimated market value of $1,637,300.

[16] The defendant also asserts that the plaintiff violated the 2016 stipulation by, inter alia, failing to engage in coparenting, thereby warranting the relief that he requests. The court made no findings in its July 26, 2022 decision concerning the plaintiff's alleged noncompliance with the 2016 stipulation. Thus, we lack any pertinent findings to review in connection with this assertion. Additionally, we note that the defendant's claims previously were considered, and rejected, by the court. In 2017, the defendant filed a motion for contempt claiming that the plaintiff, inter alia, refused to engage in coparenting in accordance with the dissolution judgment and the 2016 stipulation. On March 2, 2018, the court, *Heller, J.*, rejected those claims and denied the defendant's motion for contempt. The defendant appealed from that judgment, which this court affirmed. See *Margarita O.* v. *Fernando I.*, 187 Conn. App. 902, 200 A.3d 226, cert. denied, 331 Conn. 908, 203 A.3d 569, cert. denied,      U.S.      , 140 S. Ct. 80, 205 L. Ed. 2d 28 (2019).

his share of the sale proceeds, attorney's fees that he purports to have incurred in connection with his April 25, 2022 motion for contempt. This claim warrants little discussion.

In its July 26, 2022 decision, the court determined that the defendant was not entitled to attorney's fees in connection with his April 25, 2022 contempt motion, stating: "If [the defendant] had paid [attorney's fees] or owed any, the court might consider [awarding him attorney's fees]. But he owes nothing and has paid nothing. He hasn't been represented by an attorney—even one working for free—so the court can't order fees to be paid."

The defendant maintains that, although he is a self-represented party in the present action, he is an attorney licensed to practice law outside of Connecticut and, therefore, is entitled to recover attorney's fees. The defendant cites no legal authority to support this proposition. Moreover, our precedent demonstrates that, pursuant to Connecticut law, self-represented attorney litigants are barred from recovering attorney's fees. See *Jones* v. *Ippoliti*, 52 Conn. App. 199, 212, 727 A.2d 713 (1999) (plaintiffs, who were partners in law firm, could not recover attorney's fees for services provided by law firm because any representation by law firm "would have been of a pro se nature" and, under Connecticut law, "pro se litigants are not entitled to attorney's fees"); see also *Rosenthal Law Firm, LLC* v. *Cohen*, 190 Conn. App. 284, 294, 210 A.3d 579 (2019) ("[this] court's conclusion [in *Jones*] that self-represented attorney litigants cannot recover attorney's fees constitutes an alternative holding, not dictum"). Thus, we reject the defendant's claim.

D

Last, the defendant claims that the court improperly ordered him to pay the plaintiff $25,000 in postsecondary educational support, which the court deducted from

his share of the sale proceeds. The defendant maintains that, pursuant to the clear and unambiguous terms of the 2016 stipulation, the court lacked jurisdiction to order postsecondary educational support in light of the disparity between the parties' incomes and financial means. In contrast, the plaintiff argues that the 2016 stipulation was clear and unambiguous in authorizing the court to retain jurisdiction over postsecondary educational support even when the parties did not have comparable incomes and financial means. For the reasons that follow, we conclude that the court erred in requiring the defendant to pay the plaintiff $25,000 in postsecondary educational support.[17]

In the dissolution judgment, pursuant to § 46b-56c, the court expressly retained jurisdiction over postsecondary educational support for the parties' three children. In the 2016 stipulation, as approved by the court, the parties agreed to terms implicating, and constraining, the court's retention of jurisdiction over postsecondary educational support. Paragraph 5 of the 2016 stipulation

---

[17] In discussing the propriety of the court's award of postsecondary educational support to the plaintiff, the parties, as well as the court, refer to the court's "jurisdiction" to enter such an award pursuant to § 46b-56c. Although § 46b-56c does not contain the word "jurisdiction," our case law has described the nature of the court's powers under § 46b-56c in terms of jurisdiction. See, e.g., *Leonova* v. *Leonov*, 201 Conn. App. 285, 308, 242 A.3d 713 (2020) ("[b]ecause the statutory scheme anticipates that a dissolution may occur in advance of the time postsecondary educational decisions appropriately can be made, it provides a mechanism for the court *to retain jurisdiction* for the purpose of ordering educational support for adult children" (emphasis added)), cert. denied, 336 Conn. 906, 244 A.3d 146 (2021). As it does not affect the outcome of the issue before us, we leave for another day the question of whether an award of postsecondary educational support entered pursuant to § 46b-56c implicates the court's jurisdiction or its statutory authority to act. See *Amodio* v. *Amodio*, 247 Conn. 724, 727–30, 724 A.2d 1084 (1999) (addressing distinction between trial court's " 'jurisdiction' " and its " 'authority to act' " under particular statute). Nevertheless, because the parties and the court refer to the court's "jurisdiction," we use the same term for sake of ease, without attaching the significance that that word typically suggests.

provides: "*Subject to the proviso per* [*paragraph*] *10*
. . . [the] [p]laintiff hereby acknowledges that [the]
[d]efendant by virtue of the terms set forth hereinbe-
fore, shall be deemed to have satisfied in full all financial
obligations set forth in [the 2016] [s]tipulation and the
[dissolution judgment], and [the] [d]efendant shall have
no further obligation to pay any sums to [the] [p]lain-
tiff." (Emphasis added.) Paragraph 10 provides: "The
parties agree that if the [d]efendant were to have income
as well as financial and patrimonial means comparable
to the [p]laintiff, the [d]efendant will assume his equal
share of the [postsecondary] educational expenses of
their children paid by the [p]laintiff. [Subject] to the
prior, if the [d]efendant were not to pay for those
expenses, the [c]ourt shall retain jurisdiction over said
issue pursuant to [§ 46b-56c] for all of the three . . .
children of the marriage."

In its January 31, 2022 decision, in addressing the
parties' dispute regarding the issue of postsecondary
educational support, the court first observed that, for
purposes of paragraph 10 of the 2016 stipulation, the
parties did not contest that they did not have "compara-
ble income[s]." The court then observed that the parties
proposed conflicting interpretations of paragraph 10,
with (1) the defendant arguing that he had no liability for
postsecondary educational support under the provision
and (2) the plaintiff contending that, pursuant to the
provision, the court retained jurisdiction to determine
the parties' respective obligations for such support. The
court determined that both parties presented reason-
able interpretations of paragraph 10 and, thereafter,
permitted them to submit evidence as to the meaning
of that ambiguous provision. After examining the lan-
guage of paragraph 10 and the evidence admitted into
the record, the court concluded that it retained jurisdic-
tion regarding postsecondary educational support pur-
suant to the 2016 stipulation, with the court citing a

certain email in the record as "support[ing] the conclusion that the parties treated education as a separate topic" and "plainly reflect[ing] that [the defendant] expected to deal with college expenses again in the future." The court subsequently ordered the defendant to pay the plaintiff $25,000 in postsecondary educational support, which the court deducted from the defendant's share of the sale proceeds.

We disagree with the court's conclusion that paragraph 10 of the 2016 stipulation was ambiguous vis-à-vis the court's jurisdiction to entertain postsecondary educational support. Turning first to paragraph 5, that provision expressly states that, "[s]ubject to" the terms of paragraph 10, the defendant "shall be deemed to have satisfied in full all financial obligations set forth in [the 2016] [s]tipulation and the [dissolution judgment], and [the] [d]efendant shall have no further obligation to pay any sums to [the] [p]laintiff." Paragraph 10, in turn, sets forth the limited circumstances pursuant to which the defendant would remain liable for his financial obligations to the plaintiff. Specifically, paragraph 10 provides that (1) the defendant would "assume his equal share of the [postsecondary] educational expenses of [the parties'] children" that the plaintiff paid "if the [d]efendant were to have income as well as financial and patrimonial means comparable to the [p]laintiff," and (2) "[subject] to the prior, if the [d]efendant were not to pay for those expenses, the [c]ourt shall retain jurisdiction over said issue pursuant to [§ 46b-56c] . . . ."

We construe paragraph 10, in clear and unambiguous terms, to authorize the court to retain jurisdiction over postsecondary education support *only if* (1) the parties had comparable incomes, as well as "financial and patrimonial means," thereby triggering the defendant's obligation to share the cost of the children's postsecondary educational expenses, and (2) the defendant failed to

satisfy that obligation thereafter. Indeed, the second sentence in paragraph 10 begins with the clause "[subject] to the prior," which plainly references the preceding sentence describing the defendant's obligation to pay an equal share for postsecondary educational support only when, among other things, the parties' incomes were "comparable . . . ." Moreover, the second sentence in paragraph 10 provides that the court would retain jurisdiction over postsecondary educational support "if the defendant were not to pay for *those expenses* . . . ." (Emphasis added.) The phrase "those expenses" unequivocally refers to the expenses described in the preceding sentence, namely, postsecondary educational expenses for which the defendant would be liable in the event that, inter alia, the parties' incomes were "comparable . . . ." Put another way, pursuant to the 2016 stipulation, if the parties did not have "comparable incomes," and, consequently, the defendant was not obligated to pay an equal share of the children's postsecondary educational expenses, no dispute could arise as to the defendant's nonexistent support obligation, leaving the court with nothing over which to exercise its jurisdiction as to postsecondary educational support.

In the present case, as the court found, the parties agreed that their respective incomes were not comparable. Without that necessary factual predicate, we conclude that, pursuant to the clear and unambiguous terms of the 2016 stipulation, which limited the scope of the court's retention of jurisdiction over postsecondary educational support in the dissolution judgment, the court lacked jurisdiction to consider the issue of postsecondary educational support and to order the defendant to pay such support.[18] It necessarily follows that

---

[18] In light of our conclusion that the 2016 stipulation was clear and unambiguous with respect to the court's jurisdiction over postsecondary educational support, we need not address the court's conclusion construing the 2016 stipulation on the basis of extrinsic evidence. See *Murchison* v. *Waterbury*, 218 Conn. App. 396, 413, 291 A.3d 1073 (2023) ("[e]xtrinsic evidence

the court improperly reduced the defendant's share of the sale proceeds by $25,000 in postsecondary educational support.

The judgment is reversed only with respect to the award to the plaintiff of $25,000 in postsecondary educational support and the case is remanded with direction to vacate the portion of the July 26, 2022 distribution order reducing the defendant's share of the proceeds from the sale of the parties' marital residence by $25,000 for postsecondary educational support; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

may be considered in determining contractual intent *only if* a contract is ambiguous" (emphasis added; internal quotation marks omitted)).